552 S.E.2d 300

**The STATE, Respondent,**

v.

**Felix CHEESEBORO, Appellant.**

**No. 25347.**

Supreme Court of South Carolina.

Heard June 20, 2001.
Decided Aug. 27, 2001.
Rehearing Denied Sept. 27, 2001.

528

Senior Assistant Appellate Defender Wanda H. Haile, of S.C. Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General S. Creighton Waters; and Solicitor Warren B. Giese, all of Columbia for respondent.

MOORE, Justice:

Appellant was charged with the 1996 armed robbery and execution-style shooting of three victims at Kelly's Barbershop in Columbia. One victim survived the shooting and identified appellant as the perpetrator. The State sought the death penalty. The jury found appellant guilty of three counts of armed robbery, three counts of kidnaping, two counts of murder, and one count of assault and battery with intent to kill but did not recommend death. The trial judge sentenced appellant to consecutive terms of thirty years for each armed robbery, thirty years for the kidnaping of the surviving victim, life without parole for each murder, and twenty years for assault and battery with intent to kill. We affirm.

## FACTS

Kendrick Davis worked as a barber at Kelly's. On the morning of March 14, 1996, he arrived at work around 6:10 a.m. Mr. Kelly was already cutting a customer's hair and

another customer, Leon Poole, was waiting. After confirming that Mr. Poole did not need his services, Davis sat down with a cup of coffee to read the newspaper. As Mr. Kelly's first customer was walking out the door, Davis overheard someone ask for the time. A few minutes later, Davis lowered his newspaper and saw a black man wearing a toboggan cap standing in front of him with a gun. The man told him it was a holdup and instructed him to get up and go to the back room. At trial, Davis identified the man as appellant.

Davis tapped Mr. Kelly on the shoulder and told him they were being robbed. Mr. Kelly and Mr. Poole, who were both in their 70's, were slow-moving. Davis led them to the back room which was very small and narrow. When they reached the back room, appellant ordered them back to the front where he told them to get on their knees and throw their wallets out on the floor. At this point, appellant pulled his cap down over his face. Mr. Kelly fumbled getting his wallet out and appellant ordered them to hurry up. Finally, appellant told them to get up and go back to the room at the back of the shop. Davis again led the way.

Appellant ordered the three men onto their knees with their hands behind their heads. Davis heard one shot, then another. The third shot struck him in the left thumb and the back of the neck. Davis lay on the floor and waited there several minutes. Mr. Poole, who weighed about 200 pounds, had fallen on top of him and they were all three lying in a pool of blood. Davis had some difficulty getting up but he was finally able to reach the telephone and dial 911.

Police arrived shortly thereafter and transported Davis to the hospital where he was interviewed almost immediately. Davis gave a description of the assailant as a black male in his mid-twenties, medium build, about 5'10". He gave a similar description later that day except he added that the perpetrator had a thin mustache. On March 15, Davis met with a forensic artist who developed a composite drawing based on Davis's description of the assailant.

Meanwhile, SLED analyzed three bullets from the barbershop crime scene and concluded they had been shot from the same gun that was used to kill a cab driver at a shopping mall in Richland County on February 19.

During this time, appellant was living with his sister, Glenda Love, in Eau Claire. He moved in with her after his release from prison on February 2, 1996. Appellant, who was an aspiring rap artist, had legally changed his name to "King Justice." He worked part-time for a janitorial service.

Appellant was not at home in the early morning hours of March 14. Love did not speak with him until early that evening when he asked if she had heard about the barbershop shooting. During the next few days, Love noticed a newspaper article about the killings in which someone had highlighted the words "execution style." She noticed that other articles had been clipped from her newspapers.

Love saw the composite drawing of the suspect in the paper and thought it looked like appellant. She also thought the description of the hat and coat worn by the suspect matched appellant's. At some point, she found shoes wrapped up in a brown leather jacket. Finally, on March 27, she found a gun in a shopping bag in her house.

Love became alarmed and alerted police. The next day, March 28, police executed a search warrant at the Love residence but found nothing relevant except the newspaper clippings and a ski cap with two holes in it. Love testified she never saw the gun again.

Nothing further happened in the investigation of this case until October 1996. On October 3, officers executed a search warrant in an unrelated case at the residence of Lamont Hilliard on House Street in Columbia. They were looking for stolen goods reportedly at that location. During the search, police confiscated a .38 caliber Smith & Wesson handgun. SLED subsequently matched this gun to the bullets from the barbershop and cab driver murders.

As a result, Lamont Hilliard was interviewed by police. Hilliard told police he got the gun from Bernard Johnson in May 1996. Police then interviewed Bernard Johnson who stated he bought the gun on the street in November 1995 and gave it to appellant shortly after appellant got out of prison around the end of January 1996. Appellant returned the gun to Johnson in May or June 1996, and Johnson left it with

Hilliard. Johnson told police appellant said he had used the gun to commit the barbershop murders.[1]

The same day Johnson was interviewed, police had appellant transported from Greenville where he was incarcerated on another charge. Appellant admitted receiving Johnson's .38 in February of 1996 but claimed not to remember how long he had possessed it.

Police then executed a search warrant at Glenda Love's residence where appellant had been living. They found the name "Virgil Howard" on some letters addressed to appellant and ascertained that Virgil Howard was an inmate. Prison officials then confiscated letters written by appellant from Howard's cell. Appellant stipulated he wrote these letters. The first letter reads as follows:

> Yo, Peace G, I got everything, even two letters from you. Things have been slow, but send them flicks because next time you write, my check will be cashed by then. I'm working with a janitorial service, so I can pay the payroll officers. Bust it. You know this shit ain't me. I got to have a backup when my licks don't go over. Read my last letter, you'll see where I told you about the Cee–Allah–Born. That didn't come out right because he tried to stag, so I sent him to the essence. You've heard about it. It was the one down by the mall last month. . . . Now that I got my God–U–Now back, I'm about to get busy tonight, March 1 $^{st}$ . . . I $300 (*sic* ) for the demo tape, so someone's got to go.

Law enforcement officials familiar with a code used by inmates testified that "Cee–Allah–Born" means "cab," "God–U–Now" means "gun," "licks" means robbery, and "to stag" means "to resist." There was only one cab driver murder in the first three months of 1996 and it was the one matched to the .38.

The second letter reads as follows:

> Yo, Peace G, Yo, Black, I'm telling you, shit ain't so swift as I thought. The licks that I thought were going to put me on turn out to be locked down with Self–Allah–Father–

---

**1.** Johnson's statement also indicates appellant told him he killed the cab driver but Johnson denied this at trial.

Equality. So I just got small change. But I'm about to make a mad move Tuesday night 20 [th], that's going to put me on or put me away. Things are looking up for my music goals. I'm meeting with this kid that works in the music department for Black Newspaper. He gone to the Soul Train Music Awards, but he'll be back Monday.... I've got this bull-shitting job so I can buy some things for my capers on them devils Tuesday. The lyrics aren't all that sharp, but the beat is going to be the shit. I had to leave your stuff in my folder in the jail with this God Body because I was licking that night, but I'm sending for it now. Write Shabazz and tell him what's up but keep the caper between us, all right? Yo, Black, hang in there with me. I'm striving hard to get on and stay out at the same time. So I haven't forgot you, I've just been making a lot of moves. Write when you get this. Peace, King Justice. I got the stamps and envelopes from a lick I made. If I send one too many, just keep it for yourself.

Law enforcement translated "Self–Allah–Father–Equality" as meaning "safe." There was an unopened safe at the barber-shop.

Finally, inmate Dan Temple testified that appellant told him while they were incarcerated together that he (appellant) was charged with the barbershop murders, that one of the victims had lived, and that he wished he had shot him again.

## DISCUSSION

### 1. Destruction of gun

■ Appellant contends the murder weapon and any testimony regarding it should have been suppressed, or the indictments against him dismissed, because the gun was destroyed before the defense team could examine it. We disagree.

The State presented the following evidence at a pre-trial hearing. Officer Conyers of the Columbia Police Department, who confiscated the gun from Hilliard's residence on October 3, 1996, checked over a four-day period for a report that it was stolen. When her check turned up no owner, she tagged the gun "destroy or sell" and placed it in the evidence room. All this was done pursuant to normal department procedures.

On October 16, the gun was transported to SLED for testing in an unrelated shooting case. The next day, Agent Paavel test-fired the gun and discovered that the markings on the test-fired bullets matched the markings on the bullets from the barbershop and cab driver killings. He took photographs of the gun, including the serial number, and reported his test results to the Columbia Police Department and the Richland County Sheriff's Office. Agent Paavel kept the bullets retrieved from the two murder scenes and the test-fired bullets but eventually returned the gun to the Columbia Police Department. He put the gun in an envelope, marked the envelope "do not destroy," and indicated it contained the barbershop murder weapon.

Officer Lewis of the Columbia Police Department testified she received the gun back from SLED on March 4, 1997. It still had the original Columbia Police Department tag indicating no owner. There was nothing indicating it was related to the barbershop murders. Following normal procedures, Officer Lewis advertised the gun in the newspaper as unclaimed property. Finally, on May 20, it was destroyed with a group of 140 weapons.

The trial judge denied appellant's motions for suppression or dismissal of the indictments ruling there was no bad faith in the destruction of the gun, the bullets were still available to the defense, and there was no prejudice to the defense because the gun was incriminating rather than exculpatory. The evidence regarding the care of the gun by police was introduced at trial and the jury was charged at the close of the case that the evidence was introduced "as to the issue of the degree of care exercised by the agents of Columbia Police Department charged with the custody and preservation of evidence."

We find no error in the trial judge's ruling. The State does not have an absolute duty to preserve potentially useful evidence that might exonerate a defendant. *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *State v. Mabe,* 306 S.C. 355, 412 S.E.2d 386 (1991); *State v. Jackson,* 302 S.C. 313, 396 S.E.2d 101 (1990). To establish a due process violation, a defendant must demonstrate (1) that the State destroyed the evidence in bad faith, or (2) that the evidence possessed an exculpatory value apparent

before the evidence was destroyed and the defendant cannot obtain other evidence of comparable value by other means. *State v. Mabe, supra; State v. Jackson, supra.*

Appellant has failed to demonstrate any evidence of bad faith. The Columbia police officers testified they followed normal procedures in destroying the gun and there was no indication on the gun connecting it to the barbershop murders at the time of its destruction. While there is evidence of a lack of care, there is no evidence of an intentional destruction of relevant evidence in this case.

Further, appellant has not demonstrated in the alternative that the gun had exculpatory value that was apparent before it was destroyed. Appellant's expert testified the actual gun rather than the photographs of it should have been presented to the witnesses for identification. None of the witnesses, however, including appellant at the time he gave his statement, expressed any doubt that the gun in the photographs was the gun given to appellant. Further, Agent Paavel definitively identified the murder weapon as the gun in the photographs. There is no evidence of any apparent exculpatory value especially given the fact that the gun was recovered months after the crime and fingerprints were not an issue.

Finally, all of Agent Paavel's reports and the documentation of his microscopic comparison of the bullets from the murder scene with the test bullets fired from the gun, in addition to the bullets themselves, were available to the defense. Accordingly, comparable evidence was available from a source other than the gun.

The trial judge properly denied appellant's motions on this ground.

### 2. Kendrick Davis's identification of appellant

■ Appellant moved to suppress Kendrick Davis's identification on the grounds it was tainted by an unreliable hypnosis session and appellant was deprived of his right of confrontation. The trial judge denied the motion following a pre-trial hearing.

Kendrick Davis, the surviving victim of the barbershop shootings, gave a description of the perpetrator to police the day of the murders. The next day, March 15, 1996, Davis

worked with a forensic artist who developed a composite drawing based on Davis's description. On April 5, Davis was shown a photographic line-up with six subjects approximating the description he had given. He failed to identify any of them as the perpetrator.

On May 14, Davis met with a hypnotist, Robert Sauer, who explained the procedure that would be used and introduced Davis to relaxation techniques. At a second session on May 21, Davis was accompanied by a police officer and a second forensic artist. Davis gave a description of the assailant and a second composite drawing was made. No pictures, other than the composite itself, or photographs were shown to Davis during the session.

Five months later, on October 22, Davis was shown a second photographic line-up in which he identified appellant as the perpetrator. Detective Mead, who was present, testified Davis became very emotional when he saw appellant's photo and exclaimed he would never forget appellant's face.

Appellant first contends Davis's identification was rendered unduly suggestive by the hypnosis session on May 21. An in-court identification of an accused is inadmissible if a suggestive out-of-court identification procedure created a very substantial likelihood of irreparable misidentification. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Stewart*, 275 S.C. 447, 272 S.E.2d 628 (1980). To determine the admissibility of an identification, the court must determine (1) whether the identification process was unduly suggestive and (2) if so, whether the out-of-court identification was nevertheless so reliable that no substantial likelihood of misidentification existed. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Moore*, 343 S.C. 282, 540 S.E.2d 445 (2000).

In this case, under the first prong, there is no evidence the hypnosis session rendered the identification process unduly suggestive. The transcript of the session reveals nothing coercive in the dialogue between Davis and the hypnotist. Appellant complains there is a ten-minute gap in the tape of the session during which "suggestability violations," such as showing appellant's photograph, could have taken place. The hypnotist explained the ten-minute gap was caused by his

inadvertent failure to turn on the volume at the beginning of the third tape while he was recording the session. Officer Mead, who accompanied Davis, testified that Davis was not shown any photographs and that the second composite was based entirely on Davis's description of the suspect. Finally, we have examined the composite drawing based on Davis's pre-hypnosis description and the one drawn during the hypnosis session and find them remarkably similar.

Moreover, even if the procedure used was unduly suggestive, there is no substantial likelihood of misidentification under the second prong of the *Neil v. Biggers* analysis. The following factors are to be considered in evaluating the totality of the circumstances to determine the likelihood of a misidentification: (1) the witness's opportunity to view the perpetrator at the time of the crime (2) the witness's degree of attention (3) the accuracy of the witness's prior description of the criminal (4) the level of certainty demonstrated by the witness at the confrontation and (5) the length of time between the crime and the confrontation. *State v. Moore, supra.*

Here, Davis saw the perpetrator face-to-face in a well-lit place for several minutes, Davis had a gun pointed at him at the time and was paying very close attention, his description consistently matched appellant, he expressed absolutely no doubt about his identification of appellant at the photographic line-up, and the time between the crime and the line-up was about seven months. Under these circumstances, the trial judge did not abuse his discretion in refusing to suppress Davis's identification of appellant. *Id.* (decision to admit eyewitness identification is within trial judge's discretion); *accord Harker v. Maryland,* 800 F.2d 437 (4th Cir.1986) (consistency of eyewitness's description before, during, and after hypnosis provided ample basis for witness to testify before jury).

Next, appellant contends the use of post-hypnotic evidence violated his Sixth Amendment right of confrontation under *State v. Evans,* 316 S.C. 303, 450 S.E.2d 47 (1994). To determine whether the admission of post-hypnotic testimony violates the Confrontation Clause, we must consider whether the hypnosis affected the witness's ability to testify and respond freely to cross-examination. *Id.* (*citing McQueen v.*

*Garrison,* 814 F.2d 951, 958 (4th Cir.), cert. denied, 484 U.S. 944, 108 S.Ct. 332, 98 L.Ed.2d 359 (1987)). In determining whether post-hypnotic testimony is independent of the dangers associated with hypnosis, we will consider whether (1) the witness's trial testimony was generally consistent with pre-hypnotic statements (2) considerable circumstantial evidence corroborated the witness's post-hypnotic testimony and (3) the witness's responses to examination by counsel generally were not the automatic responses of a pre-conditioned mental process.

Davis's identification of appellant at trial was consistent with his pre-hypnotic description of the assailant. The identification was corroborated by evidence appellant was in possession of the murder weapon at the time of the barbershop murders and that he confessed to both Bernard Johnson and Dan Temple. Davis was cross-examined extensively about his identification and admitted there were some details he could not recall, such as whether the assailant was wearing gloves or what kind of shoes he had on. His responses to questioning give no indication of being pre-conditioned. Further, appellant presented expert testimony and fully argued the unreliability of Davis's post-hypnotic testimony to the jury.

In conclusion, under *State v. Evans,* there is no Confrontation Clause violation and the trial judge did not abuse his discretion in allowing Davis's identification.

### 3. *Kendrick Davis's impeachment with prior convictions*

On direct examination, Kendrick Davis admitted he was convicted of murder in May 1977 and was on parole for life. He was further impeached on cross-examination with a 1968 conviction for safecracking and possession of safecracking tools, an administrative adjudication of embezzlement while he was in prison in 1981, and an admission that he did not pay income tax while he worked as a barber at Kelly's.

Appellant claims the trial judge erred in refusing to allow him to further impeach Davis with 1968 convictions for grand larceny and housebreaking, and a 1966 unlawful drug conviction. He argues this evidence is admissible under Rule 609, SCRE.

Rule 609(b) provides in pertinent part:

(b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of *more than ten years* has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, *unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.*

(emphasis added).

■■■ We find the evidence of these convictions was properly excluded under Rule 609(b). First, narcotics offenses are generally not considered probative of truthfulness, *State v. Aleksey,* 343 S.C. 20, 538 S.E.2d 248 (2000), and appellant has failed to show why the ten-year limit should be overridden as to Davis's 1966 drug conviction. Second, the defense emphasized in closing that it was not challenging Davis's honesty but only the accuracy of his memory. Davis's criminal record therefore has little or no probative value and the 1968 convictions for housebreaking and grand larceny were properly excluded under the ten-year rule.

The trial judge did not abuse his discretion in refusing to allow Davis's impeachment with these convictions.

### 4. *Kendrick Davis's impeachment with racial slur*

■■■ As impeachment evidence, appellant proffered the testimony of Kendrick Davis's co-worker, Stanley Davis, who would have testified that Kendrick Davis stated after identifying appellant in the photo line-up: "Yes, I picked out the individual, but you know how it is, all these niggers look alike." The trial judge ruled he would not allow the witness to use the word "niggers" but permitted him to answer affirmatively defense counsel's question whether Kendrick Davis had said "all blacks look alike." Kendrick Davis was asked during cross-examination whether he had made this statement and he denied it.

Appellant contends the trial judge's refusal to allow him to cross-examine Kendrick Davis with the statement using the word "niggers" violated appellant's confrontation rights. We disagree.

The right to meaningful cross-examination of an adverse witness is included in the defendant's Sixth Amendment right to confront his accuser. *State v. Smith,* 315 S.C. 547, 446 S.E.2d 411 (1994); *State v. Graham,* 314 S.C. 383, 444 S.E.2d 525 (1994). The trial judge retains wide latitude, however, to impose reasonable limits on cross-examination that is only marginally relevant. *State v. Aleksey, supra; State v. Smith,* 315 S.C. at 552, 446 S.E.2d at 411 (*quoting Delaware v. VanArsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

In this case, the defense emphasized in closing argument that it was not challenging Kendrick Davis's honesty but only the accuracy of his memory. Appellant was permitted to challenge the accuracy of Davis's memory by impeaching him with the statement "all blacks look alike." Nothing would have been added by allowing the use of the inflammatory word "niggers." Since this evidence was irrelevant to impeach Davis's memory, there was no Confrontation Clause violation in its exclusion.

### 5. *Impeachment of defense witness Stanley Davis*

The solicitor was permitted to impeach defense witness Stanley Davis, who testified regarding Kendrick Davis's identification, with a prior conviction for impersonating an officer and his statement to investigators that he knew nothing about appellant's case. Appellant claims this impeachment evidence was improperly allowed.

First, appellant contends that impersonating an officer is not a crime of dishonesty and, since it is not punishable by a term in excess of one year, it was not admissible under Rule 609, SCRE.[2]

Evidence of a conviction of a crime involving dishonesty is admissible for impeachment regardless of the punishment. Rule 609(a)(2), SCRE. Federal courts applying this rule under the Federal Rules of Evidence have held criminal impersonation is a crime involving dishonesty and therefore admissible. *United States v. Moore,* 459 F.2d 1360 (D.C.Cir.1972); *Brundidge v. City of Buffalo,* 79 F.Supp.2d 219 (W.D.N.Y.1999).

---

2. Under S.C.Code Ann. § 16–17–720 (1985), impersonating a law enforcement officer is punishable by a term of not more than one year.

We agree with the approach taken by the federal courts and hold, since impersonating an officer involves a misrepresentation, it is a crime involving dishonesty and therefore admissible under Rule 609(a)(2) regardless of the punishment it carries.

Second, the solicitor sought to impeach Stanley Davis with evidence that Davis told the solicitor's investigator he knew nothing about the case. When asked on cross-examination, Davis simply replied that he did not recall making such a statement. On appeal, appellant mischaracterizes this cross-examination by stating the solicitor was allowed to impeach Davis with his "failure to recall an event." Davis's failure to recall was never made an issue.

The trial judge did not abuse his discretion in allowing this cross-examination of Stanley Davis. *See State v. Aleksey, supra* (scope of cross-examination within trial judge's discretion).

### 6. *Admission of cab driver murder*

Captain Williams of the Richland County Sheriff's Office testified that between 10:30 and 10:45 p.m. on February 19, 1996, he arrived at the scene of a shooting and found the victim, Elvis McDonald, standing next to his cab. McDonald said he had been shot by a light-skinned, black male about 5'8" and 130 pounds. Shortly thereafter, McDonald died of his wounds. SLED subsequently matched the bullets from this crime to those recovered from the barbershop crime scene. Evidence of McDonald's murder was admitted as evidence of motive, common scheme or plan, and identity.[3] Appellant contends this was error on several grounds.

### a. *Clear and convincing proof*

Appellant contends there is not clear and convincing evidence he committed the cab driver murder. *See State v. Beck,* 342 S.C. 129, 536 S.E.2d 679 (2000) (bad act must be proved by clear and convincing evidence to be admissible). As we re-

---

**3.** Evidence of other crimes or bad acts, although generally inadmissible to prove the defendant's bad character, is admissible when it tends to establish motive, identity, a common scheme or plan, the absence of mistake or accident, or intent. Rule 404(b), SCRE; *see also State v. Lyle,* 125 S.C. 406, 118 S.E. 803 (1923).

cently stated, the trial judge's ruling admitting bad act evidence will be upheld on appeal if it is supported by any evidence. *State v. Wilson,* 345 S.C. 1, 545 S.E.2d 827 (2001). This Court does not conduct a *de novo* review to determine if the evidence is clear and convincing. *Id.*

Here, there is evidence appellant was in possession of the murder weapon at the time of the cab driver shooting and the cab driver gave a description generally matching appellant. Further, in his letter, appellant told inmate Virgil Howard about his "licks" involving a cab "down by the mall last month" (*i.e.* February) and sending someone "to the essence." McDonald was the only cab driver murdered between January and March of 1996. This evidence is sufficient to uphold the trial judge's ruling.

*b. Insufficient similarity between barbershop and cab driver killings*

Appellant claims there is insufficient similarity between the barbershop shootings and the McDonald shooting because they happened in different settings and the number of victims was different. We disagree.

A close degree of similarity or connection between the prior bad act and the crime for which the defendant is on trial is required to support admissibility under the common scheme or plan exception. *State v. Cutro,* 332 S.C. 100, 504 S.E.2d 324 (1998); *State v. Parker,* 315 S.C. 230, 433 S.E.2d 831 (1993). In this case, there is forensic evidence that the same gun was used in both the barbershop and cab driver shootings. This fact establishes a substantial connection between the two crimes that supports the admission of evidence regarding the cab driver murder.

Further, where the defendant's own actions link two crimes together, evidence of one crime is admissible as proof of the other under the common scheme or plan exception. *State v. Bell,* 302 S.C. 18, 393 S.E.2d 364 (1990). Here, appellant himself linked the barbershop and cab driver murders in his letters to Virgil Howard.

### c. Evidence of motive or identity

Appellant contends evidence of the cab driver murder was improperly admitted to show identity and motive. We disagree.

The fact that the same weapon was used in both the barbershop and cab driver murders goes to show appellant's identity as the barbershop killer. Further, both crimes involved robbery, a motive matching appellant's expressed need for money. *See State v. Bell, supra* (evidence of motive is admissible as relevant and need not be necessary to the State's case). Accordingly, evidence of the cab driver murder establishes identity and motive.

### d. Unfair prejudice

Appellant complains the probative value of the evidence of the cab driver murder is outweighed by its unfair prejudice because a layperson would not recognize the "legal" differences between the two crimes and circumstantial evidence would lead the jury to conclude appellant committed both. *See State v. Beck, supra* (trial judge must exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice); Rule 403, SCRE.

We find the probative value of the evidence regarding the cab driver murder was great. In light of the evidence both crimes were committed with the same gun, the evidence appellant committed the cab driver murder makes it more likely he committed the barbershop murders. Evidence is unfairly prejudicial if it has an undue tendency to suggest a decision on an improper basis, such as an emotional one. *State v. Wilson, supra; State v. Alexander,* 303 S.C. 377, 401 S.E.2d 146 (1991). There is no such improper basis suggested by this evidence.

In conclusion, the trial judge did not err in admitting evidence of the cab driver murder.

### 7. Admissibility of letters to Virgil Howard

Over appellant's objection, the trial judge admitted appellant's letters to Virgil Howard ruling they were probative on the issues of identity and motive and their probative value

outweighed any unfair prejudicial effect. Appellant contends this was error.

Under Rule 401, SCRE, evidence is relevant if it has a direct bearing upon and tends to establish or make more or less probable the matter in controversy. The first letter makes more probable appellant's identity as the barbershop murderer since the cab driver murder to which the letter refers was committed with the same gun. This letter also goes to show motive in its reference to appellant's need for money. The second letter refers to appellant's robbery of a place with a safe, a detail that fits the barbershop crime and makes more probable appellant's identity as the perpetrator. This letter also goes to the issue of motive.

Appellant complains the reference to the safe is unfairly prejudicial because there is no evidence establishing that the safe referred to is the one located in the barbershop. This second letter, although undated, refers to the Soul Train Music Awards which the prosecution established occurred on March 29, 1996. Accordingly, the safe incident referred to in appellant's letter must have occurred sometime between February 2, when he was released from jail, and the end of March 1996, putting it within the time frame of the barbershop killings.

We find these letters relevant to establish appellant's motive and identity as the barbershop killer. Further, despite their violent and boastful tone, the probative value of these letters outweighs any unfair prejudice in light of the details matching both crimes.

### 8. *Excluded evidence explaining reference to a safe*

Appellant proffered testimony by an investigator with the Richland County Public Defender's office who, after speaking with appellant several days before trial, investigated a reported break-in at Andrews Travel Agency that occurred in February 1996. Appellant also proffered the testimony of the travel agent who stated that his office was broken into on the night of February 5th and his safe was moved but not broken into. Some stamps and petty cash were stolen. Appellant never proffered any declaration that he actually committed the travel agency break-in.

Appellant argued the evidence regarding the travel agency was relevant to explain the reference to the safe in his letter to Virgil Howard, thereby contradicting his connection to the barbershop murders. The State objected on hearsay grounds and the trial judge refused to allow the admission of this evidence.

 Without appellant's admission that he committed the travel agency break-in,[4] evidence regarding this unrelated crime, which may or may not have been committed by appellant, is irrelevant and therefore inadmissible. We find no error in its exclusion.

### 9. Admission of "Ruckus" lyrics.

 While appellant was incarcerated awaiting trial, prison officials seized from his cell a rap song entitled "The Ruckus." Appellant stipulated he is the author. The lyrics read as follows:

### The Ruckus, Part I

Ruckus, I believe you're a perpetrator, gold and platinum hater, cause me and J.D. is a force like Dark Vador. Who do you despise a strong enterprise? Do the greed in your eyes lead you to tell lies? Victimize me and Jermain Dupri, don't let me see or else there'll be death in this industry. Want let go, set it fo' sho', I get hype like Mike put yo' blood on the dance flo'. Blow fo' blow, toe to toe, with that no mo'. Like the 4th of July, I spray fire in the sky. If I hear your voice, better run like horses or like metamorphis, turn all y'all to corpses. No fingerprints or evidence at your residence. Fools leave clues, all I leave is a blood pool. Ten murder cases, why the sad faces? Cause when I skipped town, I left a trail [of] bodies on the ground. Your

---

4. Initially, it appears such an admission (through the investigator) would be permitted as an exception to the hearsay rule under Rule 804(b)(3), SCRE, which allows for the admission of a statement against the declarant's penal interest. This exception applies, however, only if the declarant is unavailable. Rule 804(b), SCRE. A defendant who invokes his fifth amendment privilege against self-incrimination is not "unavailable" for purposes of this rule. *State v. Terry*, 339 S.C. 352, 529 S.E.2d 274 (2000). Accordingly, evidence of such an admission would be inadmissible hearsay.

whole click ain't nothing but tricks, bitch pulling sticks, grown men sucking dicks. No one bring ruckus like King Justice, but toughest the So So Def most corruptest.

The defense objected to the admission of this document as improper character evidence. After the trial judge ruled it admissible, appellant put up evidence that violent lyrics are common to rap music and suggested an innocuous explanation of the words having to do with appellant's role in the music industry. Further, appellant introduced the lyrics to two other songs he had written entitled "I Love My Babies" and "Mama, Mama" about family-related matters.

Appellant contends he was unfairly prejudiced by the admission of the Ruckus document. While we agree this evidence should not have been admitted, we find no reversible error.

The trial judge admitted these lyrics as an admission against interest under Rule 801(d)(2), SCRE, based on the song's reference to leaving no prints and bodies left in a pool of blood. We find these references too vague in context to support the admission of this evidence. The minimal probative value of this document is far outweighed by its unfair prejudicial impact as evidence of appellant's bad character, *i.e.* his propensity for violence in general. Unlike the letters to Virgil Howard which contain identifying details of the crimes committed, these lyrics contain only general references glorifying violence. Accordingly, the Ruckus song should have been excluded. *See* Rule 403, SCRE (although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice).

■ Where there is other properly admitted evidence of conduct demonstrating the particular character trait in question, however, there is no reversible error. *State v. Brown*, 344 S.C. 70, 543 S.E.2d 552 (2001). The two letters to Virgil Howard, which have the same tone, were properly admitted and demonstrate appellant's violent disposition. We find any error in the admission of the Ruckus document harmless.

### 10. *Exclusion of letter denying cab driver murder*

■ At the same time the Ruckus song was seized from appellant's cell, a letter he wrote was also seized. The letter as proffered reads:

Yes, they do have a letter that I write in mathematics to a fraud not God admitting to doing the cab driver. But word is bond to the Father Allah, I didn't do the crime nor was I at any of the crime scenes. You see, when I was pulling a lid in '94, I was on lockup for my last two years before making my sentence of six years. This brother used to look out for me with food, radio and writing material. We got tight like cousins within them two years. So when I got out, I wanted to look out for him. But things were rough out there on my own. I didn't want to lose his trust in me. So when that cab shit came up and I read they didn't know who did it, I lied to him so he would think I was trying to come up. See, we used to talk about how we were going to do capers and shit, but I saw things different when I was in the county jail. I saw brothers getting out and coming right back, so I decided I was going to get two jobs and work on my music career. I used to tell the officers to tell him I would look out when I got straight, but I felt I was— he was giving up on me, so I used the cab thing to keep his trust.

The trial judge excluded this letter as self-serving hearsay. Appellant argues it was admissible under Rule 106, SCRE, to explain the Ruckus song.

Rule 106 provides:

When a writing, or recorded statement, or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Evidence that is otherwise inadmissible is not admissible under Rule 106. *State v. Gay,* 343 S.C. 543, 541 S.E.2d 541 (2001). Appellant's exculpatory letter contains inadmissible hearsay since it is offered for the truth of the matter asserted, *i.e.* that appellant did not commit the cab driver murder which linked him to the barbershop murders. *See* Rules 801(c) and 802, SCRE. Further, it falls under no exception to the hearsay rule. Moreover, given that it was written while appellant was awaiting trial on this matter, its trustworthiness is highly suspect.

The trial judge did not abuse his discretion in excluding this letter. *See State v. Jones,* 343 S.C. 562, 541 S.E.2d 813 (2001) (trial judge's decision to admit or exclude evidence is reviewed on appeal under abuse of discretion standard).

### 11. *Cross-examination of Sgt. Wilkerson regarding other suspects*

Appellant contends his Sixth Amendment rights were violated by the trial judge's refusal to allow him to cross-examine Sgt. Wilkerson of the Columbia Police Department regarding other suspects who falsely confessed to these murders. At trial, appellant argued this evidence was "probative to show the jury that some people boast or puff about crimes they did not do." He claimed this evidence would explain his admission to the crimes in his letters to Virgil Howard.

The right to meaningful cross-examination of an adverse witness is included in the defendant's Sixth Amendment right to confront his accuser. *State v. Smith, supra; State v. Graham, supra.* Trial judges retain wide latitude, however, to impose reasonable limits on cross-examination including questions regarding matters that are only marginally relevant. *State v. Aleksey, supra; State v. Smith,* 315 S.C. at 552, 446 S.E.2d at 411 (*quoting Delaware v. VanArsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). The fact that *other* people may confess to crimes they did not commit has little or no relevance to appellant's guilt in this case.

The trial judge did not abuse his discretion in refusing to allow this line of questioning.

### 12. *Failure to disclose information regarding Bernard Johnson*

Bernard Johnson gave Columbia police a statement indicating that he was the owner of the .38, that he gave the gun to appellant, and that appellant said he used the gun in the barbershop shootings. At the time he was interviewed by police, Johnson was in jail on unrelated drug charges.

At trial, the defense requested that the State be required to disclose the identity of the confidential informant who led police to arrest Johnson on these drug charges and the audio

tapes of Johnson's drug transactions claiming, "[W]e need to know all the relevant evidence about any testifying snitch in this case." Appellant contends the trial judge's refusal to require disclosure of this information violated his due process rights, especially in light of the fact that Johnson eventually pled guilty to the pending drug charges and received an eight-year sentence.

 Due process requires the prosecution to disclose evidence that is favorable to the accused and material to guilt or punishment. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Evidence is material only if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *State v. Cain*, 297 S.C. 497, 503, 377 S.E.2d 556, 559 (1988) (*quoting United States v. Bagley*, 473 U.S. at 682, 105 S.Ct. 3375). In determining the materiality of nondisclosed evidence, the reviewing court's function is to determine whether the appellant's right to a fair trial has been impaired. *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *State v. Taylor*, 333 S.C. 159, 508 S.E.2d 870 (1998).

We find the nondisclosure of the requested information did not deprive appellant of a fair trial. Narcotics offenses are generally not considered probative of truthfulness. *State v. Aleksey, supra.* Accordingly, the requested drug-related information regarding Johnson would have little, if any, impeachment value. Further, appellant does not argue he was deprived of information regarding any deal Johnson may have had with prosecutors.[5]

 In any event, Johnson was thoroughly impeached with nine drug charges pending from August 1996 for which he was released on bond in exchange for his testimony in this case, five additional drug charges pending from October 1996, and prior convictions for possession of an unlawful weapon, assault and battery with intent to kill, and possession and distribution

5. The record of Johnson's guilty plea indicates the prosecutors involved in appellant's case were removed from any involvement in Johnson's plea which was negotiated by a different solicitor.

of crack cocaine. Where there is an abundance of evidence detailing the witness's unabashed disrespect for the law, the nondisclosure of other impeaching evidence does not deprive the defendant of a fair trial. *State v. Gunn,* 313 S.C. 124, 137, 437 S.E.2d 75, 82 (1993). This issue is without merit.

## CONCLUSION

Appellant's remaining issues are without merit and we dispose of them pursuant to Rule 220(b), SCACR. *See* Issue 6: *Johnson v. State,* 325 S.C. 182, 480 S.E.2d 733 (1997) (prejudicial effect of question regarding post-arrest silence may be nullified by curative instruction if the jury is specifically told to disregard the evidence and not consider it for any purpose); Issues 11 & 12: *State v. Harris,* 340 S.C. 59, 530 S.E.2d 626 (2000) (mistrial should be granted only when absolutely necessary and defendant must show error and resulting prejudice); Issue 17: *State v. Burton,* 302 S.C. 494, 397 S.E.2d 90 (1990) ( no error where charge given adequately covered substance of requested charge); Issue 18: *State v. Darby,* 324 S.C. 114, 477 S.E.2d 710 (1996) (noting *Manning* charge is not mandatory and upholding *Victor v. Nebraska* charge using the "firmly convinced" language). The judgment of the circuit court is

**AFFIRMED.**

TOAL, C.J., WALLER, BURNETT and PLEICONES, JJ., concur.