In this appeal, we must decide whether the trial court erred in three of its evidentiary rulings: (1) whether certain testimon

THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT
BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING
EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
The State,       
Respondent,
 
 
 

v.

 
 
 
James A. Summersett, Jr.,       
Appellant.
 
 
 

Appeal from Charleston County
Daniel F. Pieper, Circuit Court Judge

Unpublished Opinion No. 2005-UP-373
Heard April 4, 2005  Filed June 10, 2005

AFFIRMED

 
 
 
Jack B. Swerling, of Columbia, for Appellant.
Attorney General Henry D. McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General Melody J. Brown, all of Columbia; and Solicitor Ralph E. Hoisington, of Charleston, for Respondent.
 
 
 

PER CURIAM:  James Summersett appeals his conviction for murder, arguing the trial court erred in three of its evidentiary rulings.  We are asked to decide: (1) whether certain testimony admitted was improper character evidence; (2) whether evidence of a prior bad act was properly admitted under Rule 404(b), SCRE; and (3) whether two rap songs admitted into evidence were sufficiently relevant and not unfairly prejudicial.  Finding no reversible error or abuse of discretion, we affirm.
FACTS/PROCEDURAL HISTORY
This case concerns a fatal shooting that occurred during a street brawl involving Summersett and several other individuals on April 15, 2002.  During the fight, Summersett fired a pistol, killing Julian Grant.  Summersett claimed the shooting was an accident.  He was tried and convicted for murder.
The Fight and Shooting
The fight involved two families who lived on the same street and had known each other for many years.  It erupted in front of the home of Josephine Hawkins, the victims grandmother.  Summersetts parents lived next door.
The fight initially started between Jason Grant (the victims brother) and Travis Brown (Summersetts cousin) during an argument over an unpaid debt.  Their argument quickly escalated and turned physical.  Others soon joined in the fight, including Jeremy Hawkins (the victims cousin) and Summersetts brother, Quincy.  Hawkins began striking Quincy in the head, prompting Summersett to join the fight.  Using the butt of his pistol, Summersett struck Hawkins in the head.  The victim, Julian Grant, then intervened.  According to trial testimony, Julian Grant was attempting to break up the fight, and in so doing, pushed Summersett, causing him to fall to the ground.  At that point, Summersetts gun fired,  fatally wounding Grant. 
Summersett then fled the area.  Law enforcement was called to the scene and immediately launched a search for Summersett.   A few hours after the shooting, Summersett telephoned William Thrower, an attorney who had represented Summersett in the past.  Thrower testified that Summersett explained he had shot Julian Grant by mistake.  Summersett also told Thrower he would not turn himself in until he could obtain a statement from eyewitnesses that could corroborate his version of events. 
Law enforcement continued its investigation and search for Summersett, but he managed to avoid detection in the days following the shooting.  Approximately two weeks later, Summersett was found living in a North Charleston motel where he was arrested and charged with the murder of Julian Grant.  
At Trial
Summersett testified at trial, denying he intentionally shot Grant.  On the stand, he admitted firing the weapon, but he maintained it was purely unintentional, discharging accidentally after he was pushed and fell to the ground.      
The State presented two factual theories for its murder case against Summersett.  The first theory was simply that Summersett directly intended to shoot Grant.  In support of this theory, the State called several witnesses who testified that Summersett deliberately pointed and aimed the gun at Grant and shot.  The defense attempted to counter this theory by offering the testimony of eyewitnesses who claimed the gun fired accidentally when Summersett fell and hit the ground.  Summersett also took the stand and claimed the shooting was purely accidental.  The State attempted to rebut Summersetts claim of accident or mistake by offering the testimony of William Thrower regarding a 1993 incident in which Summersett shot a friend in the foot and claimed accident.  Defense counsel objected to this evidence under Rule 404(b), SCRE.  The objection was overruled, and the testimony was admitted under the absence of mistake or accident exception to Rule 404(b). 
The second factual theory offered by the State was that Summersett actually intended to shoot another person involved in the brawlJeremy Hawkinsnot Grant.  In support of this alternate theory, the State sought the admission of two rap songs written by Summersett and recorded at his music studio that contain lyrics expressing venomous threats directed at Hawkins.  In conjunction with these songs, the State offered evidence that Hawkins had been involved in a sexual relationship with Summersetts girlfriend and also that Hawkins had been providing information to the federal government in its investigation of illegal narcotics activity in the area.  Appellant objected to the admission of the rap songs, which the trial court overruled. 
At the conclusion of the trial, the jury found Summersett guilty on all charges, and the trial court sentenced Summersett to life imprisonment without the possibility of parole.[1]
STANDARD OF REVIEW
 
In criminal cases, the appellate court sits to review errors of law only.  State v. Wilson, 345 S.C. 1, 5-6, 545 S.E.2d 827, 829 (2001).  This court is bound by the trial courts factual findings unless they are clearly erroneous.  Id. at 6, 545 S.E.2d at 829.  On review, we are limited to determining whether the trial judge abused his discretion.  Id.  This Court does not re-evaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial judges ruling is supported by any evidence. Id.  The admission and exclusion of evidence is largely a matter of trial judge discretion and his rulings will not be overturned on appeal unless he manifestly abuses his discretion and the defendant suffered prejudice as a result.  State v. Thompson, 305 S.C. 496, 502, 409 S.E.2d 420, 424 (Ct. App. 1991).
DISCUSSION
On appeal, Summersett challenges three of the trial courts evidentiary rulings.  We address these arguments individually below.
I.  Admission of Character Evidence
Summersett first argues the trial court erred in admitting improper character evidence in the form of testimony concerning the fact that Summersett
fathered six children by five different women out of wedlock.  We conclude that any error, if found, would be harmless in light of other evidence adduced at trial.
The State began its cross-examination of Summersett with the following colloquy:

SOLICITOR:  All right, Jimmy.  By way of background, lets get some clarity on some of these things.  You were talking about you have one child?
SUMMERSETT:  No.
SOLICITOR:  You actually have five children; dont you?
SUMMERSETT:  Six.
SOLICITOR:  Six children?
SUMMERSETT: Yes.
SOLICITOR:  By how many different women?
SUMMERSETT:  Five.
. . . .
SOLICITOR:  Okay.  Have you ever had any of those children while you were in wedlock with your wife?  Did you ever have any children out of wedlock?
SUMMERSETT:  Im not legally married.

Defense counsel then objected that the State was attempting to introduce improper character evidencespecifically arguing that the State was using this line of questioning to imply that if you have one child out of wedlock you are a bad person.  The trial court overruled the objection and allowed the States cross-examination on this subject to continue.
Initially, we note this argument may not be properly preserved for our review.  Defense counsels objection to the solicitors cross-examination regarding Summersett having fathered multiple children out of wedlock came only after several questions on this subject had been asked and answered by Summersett. See State v. Hoffman, 312 S.C. 386, 393, 440 S.E.2d 869, 873 (1994) (holding that a contemporaneous objection is required to preserve an issue for appellate review); State v. Sullivan, 310 S.C. 311, 314, 426 S.E.2d 766, 768 (1993) (holding that [t]o preserve an issue for appellate review, an appellant must object at his first opportunity).  Therefore, it is arguable whether Summersetts trial counsel effectively preserved the objection to this line of questioning.  
Even if properly preserved, however, we find Summersett is not entitled to relief on this issue.  Rule 404(a), SCRE, states the general rule that [e]vidence of a persons character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion . . . .  However, when the accused offers evidence of his good character regarding specific character traits relevant to the crime charged, the prosecution has the right to cross-examine him as to particular bad acts or conduct. State v. Nelson, 331 S.C. 1, 6, 501 S.E.2d 716, 718 (1998).  The State is restricted, however, to showing bad character only for the traits initially focused on by the accused. State v. Taylor, 333 S.C. 159, 174, 508 S.E.2d 870, 878 (1998). 
The State argues the trial court properly admitted the evidence regarding Summersett having fathered six children by five different women out of wedlock because Summersett put this particular character trait in issue by virtue of several repeated references to his son, Ques, during his testimony on direct examination.  These references to his son occurred during Summersetts narrative of the events leading up to the April 15, 2002, shooting.  In describing his activities and movement that afternoon, Summersett mentioned that he picked up his son from school and took him to his baseball game and that taking care of his son in this fashion was part of his normal routine.  
In its argument to the trial judge and again in this appeal, the State asserts that the cumulative effect of this testimony was to paint a broad picture that Summersett was a devoted father by showcasing only one son.  Accordingly, the State claims that Summersetts testimony regarding his son opened the door to impeachment of his good father image. 
Based on our review of Summersetts testimony we find a close question is presented as to the admissibility of the testimony at issue.  While it is perhaps arguable that Summersett was attempting to leverage his testimony to foster a good father image, it appears more likely that Summersett was simply referring to his son in a fashion purely incidental to his narrative description of the events prior to the shooting.  
Nevertheless, we find it unnecessary to reach an ultimate determination as to whether the trial judge abused his discretion in admitting this testimony because the error, if found, would be harmless in light of the other evidence of Summersetts promiscuity presented at trial.  Our supreme court has held that where there is other properly admitted evidence of conduct demonstrating the particular character trait in question, there is no reversible error. State v. Haselden, 353 S.C. 190, 196, 577 S.E.2d 445, 448 (2003); see also State v. Brown, 344 S.C. 70, 75, 543 S.E.2d 552, 555 (2001) (noting that [t]he erroneous admission of character evidence is harmless beyond a reasonable doubt if its impact is minimal in the context of the entire record); State v. Williams, 321 S.C. 455, 463, 469 S.E.2d 49, 54 (1996) (instructing that error in admission of evidence is harmless where it is cumulative to other evidence which was properly admitted); State v. Schumpert, 312 S.C. 502, 507, 435 S.E.2d 859, 862 (1993) (noting that any error in admission of evidence cumulative to other unobjected-to evidence is harmless).  
In this case, three witnesses took the stand before Summersett who each testified that Summersett had an ongoing sexual relationship with Jeremy Hawkins wife, Tasha Hawkins, while Summersett was either married or engaged to another woman.  Additionally, Jeremy Hawkins testified that he was having an affair with Summersetts fiancée, and that Summersett was aware of this fact at the time.  Summersett raised no objection to any of this testimony about his promiscuity.  Accordingly, we conclude that the States cross-examination of Summersett regarding his having children out of wedlock by different women was merely cumulative to the other, unobjected-to evidence of Summersetts promiscuity and infidelity contained in the record.  Any error by the trial court in allowing the State to pursue this line of questioning was therefore harmless.
II.  Admission of Prior Bad Act Evidence
Summersett next asserts the trial court improperly admitted into evidence a prior bad act as relevant to the issue of whether Summersett accidentally or intentionally shot the victim in the present case.  We find no abuse of discretion.
At trial, the State sought to introduce evidence that Summersett had previously been charged with assault and battery with intent to kill (ABIK) stemming from an incident in which he shot another person during an argument.  The trial court held a hearing outside the presence of the jury to determine the admissibility of this evidence.
During the hearing, the State presented the testimony of William Thrower, Summersetts former attorney.  Thrower testified that Summersett shot Ernie Riley in the foot during a confrontation between the two in 1993.  After the incident, Summersett fled the scene, but later called Riley to apologize for the shooting, claiming it was unintentional and purely accidental.  Summersett was later found, arrested, and charged with ABIK.  In his defense, Summersett claimed Riley was a friend and that he inadvertently shot Riley while aiming the pistol towards the ground.  Thrower testified that Summersett ultimately entered a plea of nolo contendere to the ABIK charge.  
The State argued that Throwers testimony was admissible to show lack of mistake or accident by Summersett when he shot Grant in the present case.  Summersett objected to the evidence of the prior shooting, arguing the incident with Riley was not relevant because it was too remote, dissimilar, and unrelated to the present charge and that admission of this evidence would be highly inflammatory and unfairly prejudicial.  He also argued that the State had failed to offer clear and convincing proof of the underlying facts of the prior shooting.
The law in South Carolina regarding the admission of evidence of prior bad acts is well established.  As a general rule, evidence of other crimes or prior bad acts is inadmissible to show criminal propensity or to demonstrate the accused is a bad individual.  State v. Pagan, 357 S.C. 132, 143, 591 S.E.2d 646, 652 (Ct. App. 2004).  Such evidence is admissible, however, when it tends to establish (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan, or (5) the identity of the person charged with the present crime. Rule 404(b), SCRE; State v. Lyle, 125 S.C. 406, 118 S.E. 803 (1923).  To be admissible under one of these permitted exceptions, a prior bad act must first be established by clear and convincing evidence. State v. Beck, 342 S.C. 129, 135, 536 S.E.2d 679, 683 (2000). Next, the record must support a logical relevance between the prior bad act and the crime for which the defendant is accused. State v. Braxton, 343 S.C. 629, 634, 541 S.E.2d 833, 836 (2001). Finally, even if relevant, the trial court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice. Rule 403, SCRE; State v. King, 334 S.C. 504, 512, 514 S.E.2d 578, 582 (1999). Of course, the decision to admit contested evidence is entrusted to the sound discretion of the trial judge. State v. Wilson, 345 S.C. 1, 6, 545 S.E.2d 827, 829 (2001). 
In the present case, the trial court admitted the evidence of the prior shooting under the absence of mistake or accident exception to Rule 404(b), SCRE, and Lyle.  However, it limited its ruling to admission of the underlying conduct, not admission of the resulting conviction.  Summersett now contends the admission of this evidence was an abuse of discretion.  We are unpersuaded.

A.      Clear and Convincing Evidence

First, we find no reversible error in the trial courts finding there was clear and convincing evidence of the prior shooting.  When considering whether there is clear and convincing evidence of other bad acts, this court is bound by the trial judges factual findings unless they are clearly erroneous. State v. Tutton, 354 S.C. 319, 325, 580 S.E.2d 186, 189 (Ct. App. 2003); see also State v. Wallace, 364 S.C. 130, 611 S.E.2d 332, 335 (Ct. App. 2005) (noting that [t]his court does not re-evaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial courts ruling is supported by any evidence). In this case, there is evidence in the record in the form of William Throwers detailed testimony concerning his direct knowledge of the prior shooting and Summersetts subsequent claim of accident.  The determination as to whether this testimony clearly and convincingly established that the prior shooting occurred is a matter well within the trial courts discretion.  Tutton, 354 S.C. at 325-26, 580 S.E.2d at 190.  We find no abuse of that discretion in light of Throwers proffered testimony.

B.      Relevance Under the Absence of Mistake
or Accident Exception to Lyle      

Having found the record supports the trial courts ruling that Summersett committed the prior bad act, we must next determine whether there is a logical relevance between the prior act and the crime charged.  We find this necessary connection is sufficiently established.  
The determination of logical relevancy does not depend simply upon an enumeration of the similarities between the two incidents.  Rather, the evidence in question is relevant if it tends to prove or disprove a material fact or element of the crime charged. See State v. Bell, 302 S.C. 18, 28, 393 S.E.2d 364, 369 (1990); State v. Fletcher, 363 S.C. 221, 241, 609 S.E.2d 572, 582 (Ct. App. 2005). [I]f  [the evidence of the other crime] is logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime. Lyle, 125 S.C. at 416, 118 S.E. at 807.
The material fact at the very center of this case concerns whether Summersett intentionally or accidentally shot the victim.  The evidence of the prior shooting of Ernie Riley is directly probative on this critical question of fact.  Evidence in the record indicates that, in both incidents, Summersett engaged in a violent confrontationwhether actual or threatenedwith an acquaintance.  Both times Summersett wielded a firearm in a threatening manner.  Ernie Riley testified that, in the first incident, Summersett confronted him on the street, grabbed Rileys gun, and threatened to shoot him.  During this altercation, Summersett fired the weapon, striking Riley in the foot.  Likewise, in the present case, Summersett entered a fight brandishing a weapon, hammer cocked, and even used the firearm as a blunt-force object to strike another person in the head.  As in the Riley incident, Summersett fired the weapon during the brawl, wounding another personthis time fatally.  In both cases, Summersett fled the scene and later claimed accident.
These closely parallel facts tend to prove Summersett acted with full knowledge of the risks that obtain when brandishing and using a firearm  when engaged in actual or threatened physical violence against another person.  Such knowledge makes it substantially less likely Summersett haplessly and unintentionally fired his weapon in the present case as he claims to have done.  The logical relevancy between the two incidents is therefore clear and unmistakable. 
We acknowledge that evidence of this prior shooting potentially paints Summersett as an individual prone to deadly violence.  This fact is not to be lightly dismissed.  Nevertheless, when, as in the instant case, the logical relevance between two incidents is clearly perceived, we may notconsistent with the mandate of Lylechoose to ignore the evidence of the prior act simply because it incidentally proves the defendant is guilty of another crime.

C.      Balancing Probative Value and
Prejudice               

Finally, even if the evidence is clear and convincing and logically relevant within a Lyle exception, the trial court must exclude it under Rule 403, SCRE, if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. See State v. Weaverling, 337 S.C. 460, 468, 523 S.E.2d 787, 791 (Ct. App. 1999) (citing Rule 403, SCRE).  We find no abuse of discretion in the trial courts ruling that the Rule 403 balancing weighed in favor of admitting the evidence.  
In this case, the Rule 403 calculus is in our view a close one.  We recognize that the violent nature of the prior act and its similarity to the crime charged enhanced the danger of unfair prejudice in this case.  However, it is exactly these close questions that give rise to the deferential abuse of discretion standard of review.  Inherent in this standard is the well-settled recognition that there are difficult evidentiary questions that turn on matters uniquely within the purview of the trial court.  
The trial court is uniquely positioned to make the careful, nuanced judgments required when balancing fact-specific concepts like probative value and prejudice, and we are reluctant to disturb the sound exercise of that discretion.[2]  See State v. Adams, 354 S.C. 361, 378, 580 S.E.2d 785, 794 (Ct. App. 2003) (noting that the Court of Appeals should review a trial courts decision regarding Rule 403 pursuant to the abuse of discretion standard and are obligated to give great deference to the trial courts judgment); State v. Grace, 350 S.C. 19, 28, 564 S.E.2d 331, 335 (Ct. App. 2002) (stating that [a] trial courts decision regarding the comparative probative value versus prejudicial effect of evidence should be reversed only in exceptional circumstances); State v. Hamilton, 344 S.C. 344, 358, 543 S.E.2d 586, 593 (Ct. App. 2001) (opining that [a] trial judges balancing decision under Rule 403 should not be reversed simply because an appellate court believes it would have decided the matter otherwise because of a differing view of the highly subjective factors of the probative value or the prejudice presented by the evidence), overruled on other grounds by State v. Gentry, 363 S.C. 93, 610 S.E.2d 494 (2005). 
Because the balancing of probative value and the danger of unfair prejudice presented such a close question in this case, we find the issue fell squarely within the ambit of the trial courts sound discretion, and we are unpersuaded of the need to overturn the trial courts decision.
III.  Admission of Rap Songs
Summersetts final argument on appeal is that the trial court abused its discretion in admitting two rap songs and related testimony into evidence.  We disagree.
The State sought to introduce the rap songs into evidence in order to prove Jeremy Hawkins was Summersetts intended target when he fired his handgun during the street brawl in April 2002.  Summersett admitted he participated in writing and producing both songs at his record studio and admitted the lyrics directly refer to Jeremy Hawkins (specifically mentioned in the song by his nickname, Scrooge).  Importantly, Summersett does not deny the clear animus towards Hawkins conveyed throughout the lyrics to these songs.  For example, Summersett explained that passages in the songs such as, Now tell me how does it feel to be the snitch on the block / You sold your soul to the devil cuz you have no heart, refer specifically to the fact that it was widely believed in the community that Hawkins was acting as a confidential informant for federal authorities in an ongoing narcotics investigation.  Along this same line, a subsequent passage reads, So you best check yourself, bulletproof yourself, and tell them feds they best help you protect yourself.  
Other parts of the songs allude to Hawkins adulterous affairs with Summersetts girlfriend and Summersetts own affair with Hawkins wife: Now let me tell you something thats true / When I was locked up, you f---ed my bitch and now Im f---ing yours too.  Again, Summersett admitted these lyrics refer specifically to Hawkins.
Defense counsel objected to the admission of these songs, arguing they were highly inflammatory because of the profanity and violence depicted and were not sufficiently probative of any intent by Summersett to harm Hawkins because the lyrics were too general or vague and were written at a time too remote from the shooting.  The trial court overruled the objection and admitted the evidence with the following instruction to the jury:

If you should decide that the lyrics are generalized music lyrics, you must not consider them in any way because generalized lyrics including any generalized threats of violence found in a musical composition are not relevant in any way.
On the other hand, should you decide the lyrics are specific as to Jeremy Hawkins, you may give those lyrics such weight, if any, as you deem appropriate only as to issues of motive and intent about which issues I will fully explain in the law in my concluding instructions to you.
You must not consider these lyrics as evidence of the defendants character or in any other way inconsistent with my specific instructions.  

The trial court did, however, grant defense counsels request that a transcript of the lyrics not be admitted into evidence.  Instead, the two rap songs at issue were played in their entirety to the jury from a compact disc recording.  
We find the trial court did not abuse its discretion in admitting the songs into evidence.  Our supreme court addressed a similar question concerning the admissibility of music lyrics in State v. Cheeseboro, 346 S.C. 526, 552 S.E.2d 300 (2001).  In that case, the trial court admitted into evidence rap lyrics the accused had written in jail while awaiting trial for the underlying murder charge.  The lyrics at issue in Cheeseboro contained violent references to leaving no prints and bodies left in a pool of blood. Id. at 550, 552 S.E.2d at 313.   Applying the basic threshold relevancy analysis set out in Rule 403, SCRE, the supreme court found the admission of this evidence was error because the lyrics lacked any connection to the crimes committed:  We find these references too vague in context to support the admission of this evidence. . . . [T]hese lyrics contain only general references glorifying violence. Id.  The court therefore concluded that [t]he minimal probative value of this document is far outweighed by its unfair prejudicial impact as evidence of appellants bad character, i.e. his propensity for violence in general.  Id.
Applying the same Rule 403, SCRE, relevancy analysis in the present case compels a different conclusion.  Unlike the vague lyrics at issue in Cheeseboro, the songs admitted in the present caseby Summersetts own admissionrefer specifically to Jeremy Hawkins.  Instead of general references glorifying violence, the songs in this case convey clear animus in the form of violent and vitriolic lyrics directed at Hawkins.  The message of these songs is therefore clearly probative of Summersetts alleged motive and intent to kill Hawkins.  While we recognize the possibility that the jury could improperly consider the overall violence and profanity of these songs as reflecting poorly upon Summersetts character and his propensity for violence in general, we find no abuse of discretion in the trial courts determination that the danger of unfair prejudice is outweighed by the probative value that arises from the pointed animus conveyed in these songs Summersett wrote and produced.  Moreover, the danger of unfair prejudice was diminished by the trial courts instruction to the jury as to the limited purposes for which they could consider this evidence.  Notably, Summersett raised no objection to the adequacy of this instruction.
For these reasons, we conclude the trial court did not abuse its discretion in admitting the two raps songs into evidence.
CONCLUSION
In sum, though we find this case presents a number of difficult evidentiary questions, we conclude the trial courts rulings did not exceed the prescribed legal and discretionary bounds discussed above or otherwise rise to the level of reversible error.  Finding none of Summersetts claims on appeal warrant reversal, we affirm his conviction in all respects.
 AFFIRMED.
 HEARN, C.J., KITTREDGE and WILLIAMS, JJ., concur.

[1] In addition to the murder charge, Summersett was also charged with possession of a firearm during the commission of a crime of violence.  In light of the sentence imposed for the murder conviction, the trial court found it unnecessary to pronounce sentence for the conviction for possession of a firearm during the commission of a crime of violence. 
[2] Viewing the record as a whole, it is notable that the Riley incident was only one of several similar prior bad acts the State attempted to admit into evidence.  Carefully applying the Lyle analysis, the trial court thoroughly examined each of these prior acts to determine admissibilityultimately finding the Riley incident alone satisfied the standard for admission.