595 S.E.2d 876

The STATE, Respondent,

v.

Errin HUTTON, Appellant.

No. 3785.

Court of Appeals of South Carolina.

Submitted March 8, 2004.

Decided April 26, 2004.

Chief Attorney Daniel T. Stacey, Office of Appellate Defense, of Columbia, for appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Charles H. Richardson and Assistant Attorney General W. Rutledge Martin, all of Columbia; and Solicitor Harold W. Gowdy, III, of Spartanburg, for Respondent.

HUFF, J.:

Following a jury trial, Errin Hutton was found guilty of three counts of kidnapping, one count of armed robbery, two counts of attempted armed robbery, one count of burglary in the first degree, and one count of grand larceny. Hutton appeals the trial judge's denial of his motion to dismiss based on the fact that his counsel was deprived of the opportunity to fully cross-examine a key State's witness when he was not provided with a pre-trial statement. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Hutton was indicted for the various charges in connection with events occurring on March 8, 2001. James Bellinger testified that on the night of the incident, he was at home with

his wife and two young children watching television when he heard a knock at the door. He found a man named Darryl and the appellant, Errin Hutton, at the door. Darryl asked Bellinger if he could get him a bag of marijuana. Bellinger, who had met Darryl on one previous occasion, told him he had to go across the street and talk to a friend to see if he could get the drugs. Bellinger was accompanied by appellant when he went across the street and asked his friend J.T. to get "a quarter bag." After being told it would be twenty-five to thirty minutes before they could get the drugs, Bellinger and appellant walked back across the street to a car. Sitting in the car's driver's seat was a woman, identified by appellant as his girlfriend, and sitting in the backseat was a man. Darryl then got in the car, and the man sitting in the backseat, Tony, got out of the car. Tony and appellant asked Bellinger if he had anything to smoke in the house, and then began telling Bellinger that he owed them $500.00. Bellinger testified that as he stepped onto his porch, a gun was pulled on him and he was instructed to go inside his home. Once inside, appellant escorted Bellinger to the bedroom, while Tony stood in the hallway to keep an eye on Bellinger's wife. While in the bedroom, appellant ransacked the area and asked where Bellinger kept his valuables. Appellant started getting upset when he could not find anything. When appellant turned his back, Bellinger attempted to get the gun, but appellant hit him in the head with the gun. Bellinger stumbled and appellant hit him again. Appellant then cocked the gun and Bellinger saw a bullet fly out of the chamber. Bellinger's wife indicated there was a phone call, at which point appellant told Bellinger to go into the living room. Bellinger's wife then realized what was happening, and told the men to leave her home. As she approached the front door, Tony picked her up and sat her on the couch. Tony then took Bellinger's wife's purse and emptied the contents. Appellant held Bellinger at gunpoint as Tony ransacked the children's room. The ordeal in the living room lasted approximately fifteen minutes, during which time appellant put the gun to Bellinger's head, and on his wife and children, and threatened to kill them in front of each other. Because appellant was becoming increasingly upset that they could find no valuables and continued to threaten the family, Bellinger told him he "knew someone [who] had some money."

Appellant got the home phone number and wrote it down and indicated he was going to leave Tony in the house so he could contact him if Bellinger "tried anything stupid."

Bellinger testified he and appellant left in a car belonging to Bellinger's wife and drove to Dusty's house. There, they ran into Carson Keen and Nathan Seals, who were in Nathan's truck. Appellant and Bellinger spoke to Carson about getting drugs, and they then left to go to Jessie's house. Jessie was not home, and they then drove to a convenience store so Carson could use a phone. Carson exited the truck and went to the pay phones while Nathan remained in his truck. Appellant instructed Bellinger to get out of the car, and as Bellinger approached the pay phones, he observed appellant talking to Nathan through the truck window. Appellant opened the truck door and sat inside it. Bellinger then noticed that Nathan "got a really scared look on his face." He saw Nathan dig through his pockets, and then take the keys out of the ignition and give them to appellant. During this time, while Carson was at the phones, Bellinger attempted to relay to Carson what was happening, but he did not seem to understand. At that time, appellant made Nathan get out of the truck, and had all of them walk into the store. After purchasing beer and cigarettes, the men walked back outside, and appellant proceeded to pull the gun on Carson to rob him. Carson pulled a knife on appellant and the two began to struggle. Bellinger and Nathan then ran, until they reached a home where the occupants allowed them to call the police. Approximately two weeks later, Bellinger identified appellant in a photographic line-up as the man who held him hostage and left the house with him that day.

Belinda Bellinger likewise testified that on the night in question, she was at home watching television with her husband and her eighteen month old and ten day old sons, when they heard a knock at their door. Her husband eventually went to answer the door, and was gone for about ten to fifteen minutes. When he returned, he was accompanied by two men. One of the men went to the bedroom while the other stood in the hallway. Belinda did not recognize either of the men. She made an in-court identification of appellant as the man who went into the bedroom with her husband.

While her husband was in the bedroom with appellant, the door was shut. The other man told Belinda everything was okay, which made Belinda suspicious. Their neighbor, J.T., from across the street called and asked to speak to Bellinger. When Belinda approached the bedroom to tell her husband he had a phone call, Bellinger and appellant exited the room. Belinda then noticed a red mark on Bellinger's neck and saw that Bellinger looked scared. She then knew something was not right. When Bellinger talked on the phone, she overheard him talk about marijuana. The men then started asking for money. Belinda told them to "take it outside," and the man who had stood in the hallway then picked her up, sat her on the couch, told her to keep her mouth shut, and removed her glasses from her face so that she could not see well. The men started saying they wanted money, and appellant opened the clip of the pistol to show Belinda the bullets and told her he was not afraid to use the gun. The men ransacked the house, dumping Belinda's purse and removing a small amount of cash from her wallet. One of them also found Belinda's pepper spray, and threatened to spray it on her son's face. The men became very angry when they could not find anything to take, and appellant held the gun to Belinda's nose and to Bellinger's temple, threatening to shoot each of them in the presence of the other.

Bellinger told appellant he could take him to get "some money or whatever he wanted," at which point appellant indicated he would go with Bellinger, while the other man stayed at the house with Belinda and the children. Appellant got the home phone number and stated he would call if anything happened. He also said he had friends outside in a car in case Belinda attempted to leave. Bellinger and appellant left the house, and the other man stayed with Belinda. Although she never saw him with a gun, the other man told her he had one and he would use it. While waiting in the house, the neighbor, J.T., kept calling on the phone and asking if everything was okay. After a while, another neighbor, Mrs. Smith, came over to the house and asked Belinda if she was okay. Belinda did not invite her inside for fear of putting her neighbor in danger. She told the neighbor she was all right, and the neighbor left. J.T. continued to call Belinda asking her what was wrong, but she could not tell him. Belinda then

noticed some headlights through the window blinds. After looking through the window and realizing there were police out there, the man ran out the back door. Belinda walked outside with her children and saw numerous police cars. She also observed a man and a woman on the ground with handcuffs on them.

Nathan Seals testified that on March 8, 2001, he was with Carson Keen at Dusty's house when Bellinger and appellant pulled up in a car. Bellinger looked like "he had fear in his eyes." He and Carson left in his truck to go to Jessie's house, with Bellinger and appellant following behind. When Jessie was not home, Carson told Nathan to drive to the store so he could use the pay phone. While in the truck, Nathan gave Carson a steak knife because he had a feeling that something was amiss. Carson exited the truck and he and Bellinger went up to the pay phone. As Nathan sat in his truck, appellant jumped inside, pulled a gun out, and shoved it into Nathan, telling Nathan he "needed to give him everything." Appellant told Nathan to remove his necklace. He asked Nathan if he had any guns, then began searching the car for any weapons. He then told Nathan that Bellinger owed him money and if he did not get it, all of them, along with Bellinger's wife and children, would be killed. Appellant stated that Belinda and the children were being held at gunpoint and if anything went wrong, he would call and have them shot. Nathan handed appellant his necklace, and appellant took the keys from the ignition.

Appellant told Nathan to get out of the truck, and all of the men walked inside the store. Some beer was purchased, and all of them walked back outside. Appellant called Carson over to talk to him, at which point he put a gun to Carson's side. Carson then pulled out the knife and held it to appellant's throat. The two men began yelling at each other, and Nathan and Bellinger ran away. After going to a couple of homes, someone finally let them in their house to call the authorities. Nathan testified he had never seen appellant before this incident. He subsequently identified appellant from a photographic line-up as the man who had robbed him that day.

Carson Keen testified that on the night of March 8, 2001, he was at Dusty's house with Nathan Seals when Bellinger and

appellant drove up and asked for some cocaine. Carson had never met appellant before. Carson told them he could get them the drugs. He noticed that Bellinger was acting like "something bad was going on." They went over to Jessie's house to get some cocaine, but Jessie was not home. Bellinger and appellant followed them to a convenience store, where Carson made some calls in an attempt to get some cocaine. Carson could not reach the dealers he was trying to call, but stayed at the phones pretending to make other calls because he was concerned about the way Bellinger was acting. Carson saw appellant get into Nathan's truck. At some point, appellant asked Carson to get him some beer. When Carson asked appellant for money to purchase the beer and appellant told Carson to "just go get it," Carson thought he was going to be robbed. When the men all walked into the store, Bellinger followed behind Carson and told him appellant was holding his family hostage. Carson purchased the beer and walked back outside toward the telephones, where he intended to call the police. Before he had a chance to use the phone, appellant called him over to the truck and pulled a gun out, sticking it in Carson's side. Appellant told Carson to get in the truck. Carson refused and appellant told him to give him all his money. At that time, Carson pulled out a knife and stuck it to appellant's throat. Appellant then ran, jumped in the truck, and drove away. Carson went into the store and told them to call the police.

Detha Smith testified that on the night of the incident, she received a phone call from J.T. As a result of that call, she went over to Belinda's house. She knocked on the door, and when Belinda answered, she observed a man sitting on the couch. Mrs. Smith asked Belinda what was wrong, because it was unusual for Belinda to be sitting in her living room with the lights out. She could also tell that Belinda was upset. When Mrs. Smith would ask her questions, Belinda was unusually quiet. Mrs. Smith told Belinda that she was going to her house to try to get some help. When she reached her home, she called 9–1–1, and shortly thereafter numerous officers arrived on the scene.

During cross-examination of Bellinger, it became apparent that Bellinger had given more than one written statement to the police. Bellinger testified that he gave a total of three

written statements. In the first statement, Bellinger wrote about one third or one half of the way down the page, but did not finish it. In this statement, he wrote only about the robbery, and did not provide any information about the drug activity. Bellinger stated, "I wrote [the first statement] and [the police officers] told me are you sure you're telling the truth. They told me we know about the drug incident. We know about there was drugs involved. And they said, if you don't tell the truth right now, admit to everything, that you could get in trouble. And that's when I wrote the next one and told the truth about everything." Bellinger said he lied on the first statement, but only by leaving out the drug activity. He stated, "[T]he only difference in the statements was the fact that I was going to try to find them drugs." Bellinger testified that the first statement was thrown away by an officer. In the second statement, which Bellinger handwrote but did not sign, he included the drug information, but did not go into details about what occurred at the house. The third statement, which was given on March 10, 2001 and included the drug activity and all of the events occurring on March 8, was provided to Hutton's counsel, but the first two were not.

At trial, the Solicitor told the trial judge he was only aware of the statement given on March 10, and he had no knowledge of the other statement until Bellinger's testimony. The trial judge allowed appellant's counsel to cross-examine Bellinger outside the presence of the jury, so he could determine what was in the first statement and use that information to impeach Bellinger in front of the jury. Thereafter, appellant's counsel moved for a dismissal of the charges arguing, because the other statements Bellinger gave were not available, he could not effectively cross-examine him. The trial judge denied Hutton's motion, ruling that he had an opportunity to question Bellinger as to the content of the first two statements, and Bellinger had admitted the information he provided was incorrect and gave the particulars of how it was incorrect. Appellant was found guilty on all charges and now appeals.

## LAW/ANALYSIS

Hutton argues the trial court erred in denying his motion to dismiss because his counsel was not provided with the initial

statement made by Bellinger, and therefore he was deprived of the opportunity to fully cross-examine a key State's witness.[1] We disagree.

Pursuant to the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). This standard requires criminal defendants be afforded a meaningful opportunity to present a complete defense. *Id.* The State does not, however, have an absolute duty to preserve potentially useful evidence that might exonerate a defendant. *State v. Cheeseboro*, 346 S.C. 526, 538, 552 S.E.2d 300, 307 (2001). Furthermore, "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Trombetta*, 467 U.S. at 488, 104 S.Ct. 2528. To establish a due process violation where the State fails to preserve evidence, a defendant must demonstrate (1) that the State destroyed the evidence in bad faith, or (2) that the evidence possessed an exculpatory value apparent before the evidence was destroyed and the defendant cannot obtain other evidence of comparable value by other means. *Cheeseboro*, 346 S.C. at 538, 552 S.E.2d at 307.

There is no evidence the State destroyed the initial statement of witness Bellinger in bad faith. Bellinger testified the officer threw away the unfinished statement after Bellinger admitted it was not the complete truth, and the officer gave him another piece of paper and told him to "write the truth." There is simply no indication the officer who threw away the first statement did so in an effort to suppress exculpatory evidence, or with any other bad faith motive. Rather, it appears the officer considered the statement that Bellinger began to write as having no evidentiary value since Bellinger himself admitted to the deception by omission in the statement.

As to the second prong, we find nothing to indicate that the evidence possessed an exculpatory value that was

---

1. Appellant challenges only the failure of the State to provide the initial statement that was allegedly thrown away. He does not make any argument regarding the second statement given on the same date in which Bellinger stated he "told the truth about everything."

apparent before the evidence was destroyed. Exculpatory evidence is evidence which creates a reasonable doubt about the defendant's guilt. *State v. Jarrell,* 350 S.C. 90, 107, 564 S.E.2d 362, 372 (Ct.App.2002). Here, Bellinger testified the only difference in the statements was that he only included the robbery in the first one, and not the fact that he was going to help the appellant find drugs. There is nothing in this statement which would create a reasonable doubt as to appellant's guilt. Nor can we find appellant could not obtain other evidence of comparable value by other means. The trial court allowed trial counsel to thoroughly cross-examine Bellinger about the first statement he gave and its contents. Further, at best, the initial statement was of value to appellant in the impeachment of Bellinger. On cross-examination, Bellinger admitted he did not initially tell one of the officer's about the drugs, he knew that he was not being truthful, and he gave a second statement after an officer accused him of lying. Thus, counsel was able to thoroughly impeach Bellinger before the jury.

■ Finally, we see no prejudice to appellant as a result of the destruction of the unfinished statement. As noted, appellant was able to effectively impeach Bellinger regarding his inconsistent statements. *See State v. Jones,* 325 S.C. 310, 322, 479 S.E.2d 517, 523 (Ct.App.1996) (appellants failed to demonstrate prejudice resulting from State's failure to reveal new statement of witness where counsel was able to impeach witness about new allegation by introducing prior statement and questioning witness about the discrepancy). *State v. Gathers,* 295 S.C. 476, 482, 369 S.E.2d 140, 143 (1988) (appellant failed to show prejudice from alleged non-disclosure of doctor's equivocation on whether wound was pre-or postmortem where appellant effectively cross-examined doctor at trial and doctor conceded she was unsure whether wound occurred before or after death); *State v. Woods,* 282 S.C. 18, 20, 316 S.E.2d 673, 674 (1984) (there was no merit to argument that appellant was denied adequate confrontation of witnesses against him based on missing medical records where treating psychiatrist testified and was fully cross-examined by appellant's trial counsel). Further, the other witnesses' testimony directly comports with Bellinger's testimony regarding the specific chain of events on March 8, 2001 and the identity of appellant as one of the perpetrators. Several of these wit-

nesses were present as the crimes occurred, including Bellinger's wife and the other victims, who testified as to the events just as Bellinger did. We find the other witnesses' testimony provides overwhelming evidence of appellant's guilt. *See State v. Bailey*, 298 S.C. 1, 5, 377 S.E.2d 581, 584 (1989) (when guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached, the appellate court should not set aside a conviction because of insubstantial errors not affecting the result).

 While we do not condone the destruction of any statements made by witnesses to the authorities, we consider dismissal of criminal charges a drastic remedy which should rarely be invoked as a sanction for the State's failure to preserve evidence. We still caution the prosecution and law enforcement authorities that the destruction of evidence will be highly scrutinized; however, we cannot find appellant was entitled to a dismissal based on the facts of this case. After considering the lack of evidence of bad faith on the part of the State in the destruction of the evidence, the importance of the missing evidence in light of the availability of evidence of comparable value, and the overwhelming sufficiency of the other evidence produced at the trial to sustain appellant's conviction, we find no error in the trial court's denial of appellant's motion to dismiss.

For the foregoing reasons, appellant's convictions are **AFFIRMED.**

STILWELL, J. and CURETON, A.J., concur.