611 S.E.2d 332

**The STATE, Respondent,**

v.

**Karl WALLACE, Appellant.**

**No. 3971.**

Court of Appeals of South Carolina.

Heard Nov. 17, 2004.

Decided March 28, 2005.

Rehearing Denied April 21, 2005.

---

132

---

C. Rauch Wise, of Greenwood, and Everett P. Godfrey, Jr., of Greenville, for Appellant.

Attorney General Henry D. McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Harold M. Coombs, Jr., all of Columbia; and Solicitor Robert M. Ariail, of Greenville, for Respondent.

HEARN, C.J.

Karl Wallace was convicted of second-degree criminal sexual conduct (CSC) with a minor. He argues the trial court erred by admitting the testimony of the victim's sister regarding an alleged prior act of criminal sexual conduct with a minor under the common scheme or plan exception to *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923), and Rule 404(b), SCRE. We reverse and remand for a new trial.

## FACTS

Wallace was accused of criminal sexual conduct with his stepdaughter. At the time of trial, Wallace had been married to the victim's mother for approximately ten years. At trial, the victim testified she was about twelve years old when Wallace first told her to come to his room and go into the bathroom to take off all of her clothes. She said he would look at her and then touch her on her chest. After he touched her, he would tell her "don't tell anyone 'cause they're not going to believe you anyway." When asked how many times this happened, the victim answered "once, like every other month or so one time." This pattern continued through the seventh and eighth grades.

Although the incidents allegedly continued over a number of years, this charge involved an act on May 8, 2001, when the victim was in the ninth grade. According to the victim, Wallace called the victim into his bedroom to talk after her mother had been taken into police custody on an unrelated matter. After asking the victim why she was sitting with her legs closed and whether she thought he was going to do something to her, Wallace pushed her back on the bed. The victim stated that Wallace "sat on top of me and like between my legs and we were just sitting there." Wallace asked her, "do you want me to be myself or be like a dog," to which she responded, "to be hisself [sic]." Wallace then removed her pajama bottoms and her underwear, forced open her legs, and started "to push his hands up [her] privates." As he continued, the victim started to scream. Wallace put a pillow over her face and told her to be quiet or he would hit her. She testified that when Wallace heard her little brother coming down the hall, he told her to go into the bathroom and get

dressed. After her brother left the room, Wallace forced her back on the bed, got on top of her, and took her pants off again. After sitting and looking at her, he told her to go get her things and leave.

A few days later, the victim's older sister came to the school to see the victim and to find out what was going on at home. The victim told her sister that Wallace had been "messing with" her. As a result of that conversation, someone from the Department of Social Services visited the victim at school. The victim subsequently filed a police report.

At trial, the State attempted to present evidence of an alleged sexual assault against the sister as proof of Wallace's guilt. Prior to the start of trial, the State moved to allow the testimony of the sister, proffering the following argument:

> It's the State's position that her testimony would be that she was also sexually abused by this defendant that [sic] the abuse started at approximately the same age with both of the victims, that being the seventh grade, roughly, for both of them, between twelve and thirteen years old; that they were both the defendant's stepdaughters; that they were both living in the home with the defendant, as opposed to visiting on weekends and the abuse happening then; that the method of the abuse essentially started the same way, it started with fondling of the breasts, is [sic] where it began; and that it would occur in the home, . . . it occurred in the bedroom; and it occurred when the mother was not home, . . . .

The State concluded by stating that the sister suffered more extensive abuse. Specifically, she was subjected to sexual intercourse and oral sex. The State asserted it "would be willing to offer to limit testimony, if you see fit, as to just the particulars that were similar." When questioned by the trial court, the State said the sister specifically did not want to bring charges against Wallace. Defense counsel argued the testimony of the sister, as to the alleged prior bad act, did not fit any exception to *Lyle* and would be grossly prejudicial to Wallace.

The trial court ordered an in camera examination of the sister. She testified that when she was in the sixth or seventh grade Wallace would come into her room to rub her back

because he was trying to get her to lose weight. He then would touch her breasts, kiss her, and perform oral sex. When she was in the eighth grade, the family moved from Louisiana to South Carolina. The sister testified Wallace would call her into his bedroom and perform oral sex, digital penetration, and sexual intercourse. She testified she told her mother about the incidents on two separate occasions. The sister testified the sexual assaults continued until she moved out of the family home during her second semester in college.

After hearing the testimony and arguments, the trial court found the testimony to be clear and convincing and ruled this evidence was admissible under the common scheme or plan exception to *Lyle*. Concluding the probative value outweighed the prejudicial effect, the trial court allowed the evidence to be presented to the jury but limited the testimony of the sister "only to the extent and only to the acts which occurred to the victim in this prosecution, and not to go beyond that, which will limit the prejudicial effect of this testimony coming in." A jury found Wallace guilty of second-degree CSC with a minor, and he was sentenced to eight years confinement.

## STANDARD OF REVIEW

On review of criminal cases, an appellate court is limited to determining whether the trial judge abused his discretion. *See State v. Wilson*, 345 S.C. 1, 6, 545 S.E.2d 827, 829 (2001). An abuse of discretion occurs when the conclusions of the circuit court either lack evidentiary support or are controlled by an error of law. *State v. Bryant*, 356 S.C. 485, 489–90, 589 S.E.2d 775, 777 (Ct.App.2003). "Concerning the admission of evidence, the trial judge's determination will be sustained absent error and resulting prejudice." *State v. Robinson*, 360 S.C. 187, 192, 600 S.E.2d 100, 102 (Ct.App.2004) (citation omitted).

## LAW/ANALYSIS

Wallace argues the trial court improperly admitted the testimony of the victim's sister as to alleged criminal sexual assaults under the common scheme or plan exception of Rule 404(b), SCRE and *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923). We agree.

██ Evidence of prior bad acts is inadmissible to prove the specific crime charged unless the evidence tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) *a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish proof of the other;* or (5) identity of the person charged with the present crime. *Lyle,* 125 S.C. at 416, 118 S.E. at 807; Rule 404(b), SCRE ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.").

██ A prior bad act must first be established by clear and convincing evidence to be admissible. *State v. Tutton,* 354 S.C. 319, 325, 580 S.E.2d 186, 189 (Ct.App.2003). This court does not re-evaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial court's ruling is supported by any evidence. *State v. Wilson,* 345 S.C. 1, 6, 545 S.E.2d 827, 829 (2001). When considering whether there is clear and convincing evidence, this court is bound by the trial court's findings unless they are clearly erroneous. *Tutton,* 354 S.C. at 325, 580 S.E.2d at 189; *State v. Weaverling,* 337 S.C. 460, 468, 523 S.E.2d 787, 791 (Ct.App.1999) (stating if a prior bad act is not the subject of a conviction, proof must be by clear and convincing evidence).

Here, Wallace does not argue the quantum of proof did not rise to the clear and convincing level. Instead, he argues the trial judge misapprehended the nature of the common scheme or plan exception as articulated in *Lyle.* Wallace urges us to review the underlying facts of *Lyle* in order to fully understand the common scheme or plan exception.

In *Lyle,* the defendant was charged with issuing a forged check in Aiken, South Carolina on January 12, 1922. 125 S.C. at 411, 118 S.E. at 805. The State introduced evidence that the defendant had committed similar crimes in Aiken on that same date, as well as similar crimes in Griffin, Georgia on January 3, 1922; Athens, Georgia on December 30, 1921; and LaGrange, Georgia on November 23, 1921. *Id.* at 413–14, 118 S.E. at 806. The allegation was the same in all the crimes: the defendant entered the bank, opened an account with a forged check using a false name, and received cash back from

his deposit. The South Carolina Supreme Court held that the evidence regarding the similar crime committed in Aiken on the same date as the crime charged was admissible to establish identity because the evidence helped to refute the alibi defense of the defendant. *Id.* at 418, 118 S.E. at 808. As to the similar crimes committed on other dates in other locations, however, the Supreme Court found the evidence inadmissible. The court stated:

> Whether such crime was committed as part of a common plan or system was wholly immaterial, unless proof of such system would serve to identify the defendant as the perpetrator of the particular crime charged or was necessary to establish the element of criminal intent. Proof of a common plan or system, therefore, in this connection is merely an evidential means to the end of proving identity or guilty intent, and involves the establishment of such a visible connection between the extraneous crimes and the crime charged as will make evidence of one logically tend to prove the other as charged. *If, as we have seen, no such connection was shown to exist between the separate Georgia offenses and the Aiken crime as would constitute them practically "a continuous transaction" or as would otherwise render this evidence relevant to prove identity, and if, as we have held, the evidence was not competent on the question of intent, it follows that it was not admissible merely to show plan or system.*

*Id.* at 427, 118 S.E. at 811 (emphasis added) (citations omitted). This notion of the *connection* which must be established between similar crimes in order to allow admission of evidence of one of the crimes in the trial of the other had been previously articulated in two New York cases, *People v. Molineux,* 168 N.Y. 264, 61 N.E. 286 (1901) and *People v. Romano,* 84 A.D. 318, 82 N.Y.S. 749 (1903), relied on by the court in *Lyle.*

In *Molineux,* the defendant was accused of murder by sending poison contained in a bottle of Bromo Seltzer[1] through the mail to the director of the Knickerbocker Athletic

---

1. Bromo Seltzer is a brand of drug used to treat stomach upset and headache. *See http://www.drug s.com/cons/Brom o_Seltzer.html* (last visited Feb. 11, 2005).

Club. 61 N.E. at 287. The director, Harry Cornish, believing the silver "Tiffany's" bottle holder containing the bottle of Bromo Seltzer to be a Christmas gift, took it to his home. Thereafter, a member of his household, Katharine Adams, took some of the bottle's contents to relieve a headache and died. At trial, the State sought to introduce into evidence that the defendant was responsible for the previous death of Henry Barnet, who died at the Knickerbocker Athletic Club after taking a dose of a powder he had received in the mail the month before Cornish received his bottle. *Id.* at 289. Both powders were in fact cyanide of mercury, a rare and deadly poison. The evidence of the prior crime was admitted in the trial court. The Court of Appeals of New York reversed, and in a very thorough-going opinion, clearly articulated the limited nature of the common scheme or plan exception to the general rule which proscribes the admission of evidence of other crimes to prove the crime charged. The New York Court stated:

> It sometimes happens that two or more crimes are committed by the same person in pursuance of a single design, or under circumstances which render it impossible to prove one without proving all. To bring a case within this exception to the general rule which excludes proof of extraneous crimes, there must be evidence of system between the offense on trial and the one sought to be introduced. They must be connected as parts of a general and composite plan or scheme, or they must be so related to each other as to show a common motive or intent running through both.

*Id.* at 299.

In *Romano*, the defendant was charged with robbing his victim by throwing snuff into his face. 82 N.Y.S. at 749. At trial, the State sought to introduce evidence that the defendant had committed another robbery at the same location upon another person by using the same method. Although the trial court admitted the evidence finding the two crimes remarkably similar, the appellate court reversed. The New York Court stated:

> There is always more or less of similarity between the commission of independent crimes of this class, and in many instances features that are common to one are found in the other; and yet it has never been supposed that, where there

was separation as to time and no connection established beyond that of place and similarity, the first crime was admissible to establish any of the elements which constituted the other.

*Id.* at 750.

■ Wallace argues that in admitting the sister's testimony, the trial judge impermissibly broadened the meaning of the common scheme or plan exception enunciated in *Lyle,* to include mere similar acts. According to Wallace, the trial judge erroneously assumed that a broader application of the exception was warranted because this case involved criminal sexual conduct with a minor. However, the appellate courts of this state have refused to recognize a specific exception to the inadmissibility of prior bad act evidence in criminal sexual conduct cases. *See State v. Nelson,* 331 S.C. 1, 14 n. 16, 501 S.E.2d 716, 723 n. 16 (1998) (ruling that evidence of defendant's general pedophile characteristics was inadmissible, and noting that "[i]n spite of the ban on character or propensity evidence, some states have nonetheless admitted evidence of collateral sexual crimes or sexual bad acts in sex offense cases, carving out a specific exception they variously term 'lustful disposition,' 'depraved sexual instinct,' or the like.... South Carolina has not recognized such an exception, nor are we inclined to do so."); *Tutton,* 354 S.C. at 328, 580 S.E.2d at 191 (finding the bar for admissibility under *Lyle* is not lower simply because sexual crimes are involved; there must still be "evidence that the defendant employed a common scheme or plan in the commission of the crimes").[2]

---

2. Wallace argues that numerous opinions from both this court and the South Carolina Supreme Court have focused exclusively on the close degree of similarity between the crime charged and the evidence of the other crime, without mentioning the "system" or relation between the two, which is the crux of the original exception. *See, e.g., State v. Hallman,* 298 S.C. 172, 175, 379 S.E.2d 115, 117 (1989) ("We find the evidence of prior bad acts bears such close similarity to the offense charged in this case that its probative value clearly outweighs its prejudicial effect."); *State v. McClellan,* 283 S.C. 389, 392, 323 S.E.2d 772, 774 (1984) ("Such evidence is inadmissible 'unless the close similarity of the charged offense and the previous act enhances the probative value of the evidence so as to overrule the prejudicial effect.' "); *State v. Patrick,* 318 S.C. 352, 356 457 S.E.2d 632, 635 (Ct.App.1995) ("There are sufficient similarities between the Georgia case and present case to apply the *Lyle* common scheme or plan

exception."); *State v. Blanton,* 316 S.C. 31, 32, 446 S.E.2d 438, 439 (Ct.App.1994) ("The prior acts were sufficiently similar to the charged offense to be admissible."); *State v. Wingo,* 304 S.C. 173, 176, 403 S.E.2d 322, 324 (Ct.App.1991) (finding the evidence of prior bad acts tended to show common plan or scheme when the experiences of each victim paralleled that of the other victims).

According to Wallace, other decisions correctly reflect a more narrow interpretation of the common scheme or plan exception. *See, e.g., State v. Brooks,* 341 S.C. 57, 62, 533 S.E.2d 325, 328 (2000) ("When the prior bad acts are similar to the one for which the appellant is being tried, the danger of prejudice is enhanced."); *State v. Parker,* 315 S.C. 230, 233, 433 S.E.2d 831, 832 (1993) ("[T]he connection between the prior bad act and the crime must be more than just a general similarity."); *State v. Rogers,* 293 S.C. 505, 507, 362 S.E.2d 7, 8 (1987) (stating that where the acts are ten years apart and the only connection between the testimony of the two daughters was that the defendant touched them both, the prior bad act evidence should have been excluded), *overruled on other grounds by State v. Schumpert,* 312 S.C. 502, 506 n. 1, 435 S.E.2d 859, 862 n. 1 (1993); *State v. Nix,* 288 S.C. 492, 496, 343 S.E.2d 627, 629 (1986) (finding where the robbery could not have been committed without the get-away-car, the relevance of the car theft to the crimes charged was easily perceived); *State v. Stokes,* 279 S.C. 191, 192–93, 304 S.E.2d 814, 814–15 (1983) (concluding the trial judge erred in admitting testimony from a witness who speculated that the defendant intended to rape her because there was no connection made between that prior bad act and the act for which the defendant was charged); *State v. Whitener,* 228 S.C. 244, 265, 89 S.E.2d 701, 711 (1955) (allowing testimony of another sexual act perpetrated against the same victim some hours after the original offense because the crimes were so related to each other that proof of one tended to establish the other); *State v. Hubner,* 362 S.C. 572, 608 S.E.2d 463 (Ct.App.2005) (stating that the similarity between separate acts must not merely be a similarity in the results; "[r]ather, there must be such a concurrence of common features that the various acts are normally to be explained as caused by a general plan of which they are the individual manifestations"); *State v. Carter,* 323 S.C. 465, 468, 476 S.E.2d 916, 918 (Ct.App.1996) (reversing defendant's conviction where there was no legal connection between the prior bad act and the crime charged); *State v. Campbell,* 317 S.C. 449, 451, 454 S.E.2d 899, 901 (Ct.App.1994) (finding absent a connection between the two acts, the testimony of prior drug sales utilizing a similar sales technique precisely the type of evidence *Lyle* prohibits).

Wallace is correct that some of the appellate decisions appear to focus exclusively on the alleged close similarity between the other crime and the crime charged, while others look beyond mere close similarity to consider the system or connection between the two. Nevertheless, sorting out any apparent inconsistencies in the appellate decisions of this state is not the province of this court. *See M & T Chems., Inc. v. Barker Industries, Inc.,* 296 S.C. 103, 109, 370 S.E.2d 886, 890 (Ct.App. 1988) (stating that an intermediate appellate court has no authority to change existing law, but maintaining that the supreme court may want to grant certiorari and modify previous decisions).

In this case, the trial court did not address any connection between the two crimes to establish if the allegations by the victim's sister were admissible. The court instead ruled, "it goes to a common scheme or plan because of the close degree of similarity between the conduct, with regards to the two victims." When the State was asked to explain why the testimony was essential to its case, the solicitor responded:

This is technically a credibility case, that's what it is. It's one witness's word against potentially another witness's word. The evidence would be relevant and would be essential to the State's case because it is a piece of evidence, just like any other piece of evidence, that goes to prove or disprove the case. And this is strictly a credibility case: Therefore, this testimony is necessary to, again, prove the victim's allegations.

This argument could be used to admit testimony of any prior crime when a defendant is accused of a subsequent but similar crime. It falls far short of the threshold for the admission of a prior crime under the common scheme or plan exception to *Lyle*. Accordingly, the trial court erred in admitting the evidence on this basis.

█ It was also error for the trial judge to attempt to limit the testimony of the sister so that there *would* be a close similarity between the prior bad act and the crime charged. The court noted that the testimony of the sister was more egregious than that of the victim and ordered the testimony redacted, stating, "I find it appropriate under *State v. Tutton* to limit the testimony of the *Lyle* witness only to the extent and only to the acts which occurred to the victim in this prosecution, and not to go beyond that, which will limit the prejudicial effect of this testimony coming in." This court in *Tutton* concluded the differences in the evidence proffered of the prior criminal sexual conduct was sufficiently different to render it inadmissible. *Tutton*, 354 S.C. at 333, 580 S.E.2d at 194. We did *not*, however, sanction the redaction of testimony in order to make similar that which is dissimilar.

█ Wallace correctly argues: "The law should not permit a trial judge to make similar that which is different by redacting a part of the testimony." This is precisely what

*Lyle* rejected. Moreover, as noted in *Lyle,* "if the court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt, and the evidence should be rejected." 125 S.C. at 417, 118 S.E. at 807. Thus, the trial court erred in endeavoring to eliminate any differences between the sister's account and the victim's testimony in order to make the sister's testimony admissible. *See State v. Hubner,* 362 S.C. 572, 608 S.E.2d 463 (Ct.App.2005) (concluding the trial court erred in limiting the testimony regarding prior bad acts to similar acts when the court recognized the differences between prior bad act and the act at issue but failed to balance the similarities and differences in determining whether the testimony was admissible at all). Rather, the trial judge should have given Wallace the benefit of the doubt and excluded the evidence. *See Stokes,* 279 S.C. at 193, 304 S.E.2d at 815 ("If there is any doubt as to the connection between the acts, the evidence should not be admitted."); *State v. Davenport,* 321 S.C. 134, 138, 467 S.E.2d 258, 260 (Ct.App.1996) (finding that where there was no clear connection between the extraneous criminal transaction and the crime charged, the accused should have been given the benefit of the doubt, and the evidence should have been rejected).

In addition to finding the admission of the sister's testimony error, we find the admission was not harmless. As in *Hubner,* the outcome of this case rested on the credibility of the victim and Wallace. 362 S.C. 572, 608 S.E.2d 463 (Ct.App. 2005). Here, the admission of the sister's testimony enhanced the credibility of the victim and was provided as substantive prove of the victim's allegations. Without the sister's testimony, we cannot say that the evidence against Wallace was conclusively established such that a guilty verdict was the only rational result. *See Tutton,* 354 S.C. at 334, 580 S.E.2d at 194 (stating that in conducting an harmless analysis, the appellate court must review the other evidence admitted at trial in order to determine "whether the defendant's guilt is conclusively established by competent evidence such that no other rational conclusion could be reached by the jury").

## CONCLUSION

Accordingly, we reverse Wallace's conviction and remand for a new trial.

**REVERSED AND REMANDED.**

GOOLSBY and WILLIAMS, JJ., concur.